The next case called is Consolidated Howell v. Dunaway and Wembling v. Bullock. My name is John Daly. I'm an attorney for Solenoid Health Care and Hospital Services. We do business at Memorial Hospital in Carbondale, St. Joseph's Hospital in Murfreesboro, which is the appellants in the Wembling matter, and Heron Hospital, which is the appellant in the Howell v. Dunaway case. The facts in both of these cases are nearly identical. It's a classic hospital lien case where the plaintiff is in a motor vehicle accident, receives medical care at the hospitals, and hospitals then file a lien against any settlement that the plaintiff may get or receive from the tortfeasor who hit the person in the first place. The case settles, and then they go to adjudicate the liens that have been filed against that settlement. In these two cases, the difference is that the plaintiff's attorney, in the petition to adjudicate the liens, requests a fee pursuant to the common fund doctrine. In most cases dealing with hospital liens that I've dealt with, the attorney doesn't file a petition asking for those type of fees. Those fees are usually limited to class action suits or subrogation cases with insurance companies. The statute dealing with this for the liens is the Illinois Health Care Services Lien Act, which gives the hospital the right to a lien against the settlement for the services it provided to the injured party. In applying the common fund doctrine, I think it's important to know what the history or where the common fund doctrine came from. It's a common law equitable remedy available in the courts of general jurisdiction and grounded in equitable principles. The appellee asserts that the common fund doctrine in this case, and correctly asserts that it's based on principles of equity that require those who have benefited from litigation to share in its costs. But as the Supreme Court of Colorado eloquently put it, summarizing the doctrine in that fashion is basically describing the roof of the house, not its walls or its foundation. Hence, when a plaintiff takes legal action to create or preserve the assets of the trust or the fund for the benefit of all beneficiaries to that fund, those beneficiaries must pay a proportionate share of the costs incurred in achieving that benefit. However, implicit in that is that the parties are on equal footing, or they're similarly situated in the action, and that but for the plaintiff's actions, the beneficiaries would have been forced to institute litigation against the tort fees for themselves in order to collect any amounts of money. In your typical subrogation case, those requirements are met, as subrogation is simply the contractual or statutory right pursuant to which an injured plaintiff's rights against the tort fees are responsible for the injuries are assigned to the subrogee or the insurance company. The subrogate insurer pays the medical bills of the insured at the outset and, as a result, succeeds to the insurer's rights against the defendant's tort fees for reimbursement of what they paid. The insurer and insured are similarly situated in that situation because they have similar rights against the tort fees. The insurance company could come in and assert their right in the lawsuit against the tort fees, the same as the insured or the person that was injured. The insurance company's right to reimbursement, therefore, is dependent upon the recovery from the tort fee themselves in the underlying case. And if they don't get anything in the underlying case, then the insured subrogee is not going to receive anything from anyone. Thus, the insured, in order to protect its right and not have to be subject to the common fund doctrine, has to actually act in the case itself. In applying that same logic to a hospital lien, there are several differences. One of the main differences is the hospital has no rights against the tort fees. They have no right of subrogation. They cannot step into the shoes of the injured plaintiff and assert the rights against the tort fees and the underlying action. Since they don't have that right, they cannot participate in that litigation in order to get paid their hospital lien. The requirements of the common fund doctrine, as set forth in several different cases, Behr, Bishop, Maynard, are the attorney creates a fund for the benefit. The party or beneficiary receiving money from that fund did not participate in the litigation, and yet they get compensated from that fund. In this situation, the second requirement is not met because we could not participate in the litigation. We are not allowed to join in the lawsuit. We have no subrogation rights in the place of the plaintiff themselves. Counsel, could you comment on the Supreme Court's Bishop case? It says that, talking about the common fund doctrine, it is irrelevant that the party who benefits from the lawyer's services has a right to compensation, be it an undifferentiated right of reimbursement or subrogation, as is asserted here, or a right to compensation under some other theory. That's correct, but if you look at the common fund doctrine itself, you have to be able to participate in it. You have to participate in it, which implies that you are able to participate in it. I think the Bishop court, in making that statement, was referring more to any type of subrogation relationship in attempting to get reimbursed from that fund. It says, be it the right of subrogation or under some other theory. What other theory is there? Well, you have the class action theory, you have the subrogation theory. I mean, there are several different places. But the Supreme Court itself, in the Maynard decision prior to that, has set out this exception to the common fund doctrine for hospital liens. And the problem with, or my problem with what the trial court did, taking that language and expanding the common fund doctrine to hospital lien cases, is incorrect because it never, Bishop dealt with basically an insurance company. It was an ERISA health plan that was seeking reimbursement for paying medical expenses. Well, that's exactly what an insurance company does. The difference in Bishop was, it was an ERISA plan, and federal preemption was the overall issue that was applied. Once they got past the federal preemption saying that didn't apply, then they were able to use the same analysis as any subrogation case would use. And obviously, the ERISA health plan, if it wasn't preempted by federal law, then the common fund doctrine would apply to that. That comment that was made in the opinion, to me, is just more addictive than anything else because they never mentioned Maynard. They never mentioned the analysis of the subrogation case versus the person, versus the hospital who simply has a lien. They didn't use an analysis of the debtor-creditor relationship, which was made in Maynard, which is when the Maynard court said that the common fund doctrine didn't apply to hospital liens. It basically said because there's a debtor-creditor relationship, the amounts owed to the hospital are independent of anything that is recovered in the underlying plaintiff's lawsuit. The hospital can collect from that plaintiff regardless of whether there's any money made in the lawsuit for the plaintiff, or there's any compensation for injuries to the plaintiff. On the other hand, the hospital can go and collect from that plaintiff regardless, whereas the insurance company cannot. I think that's one of the major differences in that case, and I find it very hard to reconcile Bishop in overruling what the court said in Maynard. And getting back to that Maynard, the case in Maynard was the exact same facts as we have today. You had a motor vehicle accident, you had a hospital lien, and you had the plaintiff's attorney trying to get one-third fee from the hospital lien's amount. If you look at Maynard and Bishop together, Maynard focused on the creation of the obligation. Correct. Bishop, it seems to be, and we're obligated to reconcile all these cases together, being it's the Supreme Court, basically said we're changing the focus to the creation of the fund rather than the creation of the obligation. What's your comment on that view of these two cases together? I think what you have to look at, though, is you look at the creation of the fund versus the way they, I'm sorry, I'm being confused here. I don't mean to confuse you, but I know it can be. But it just seems to me, Maynard says we're going to look at how this obligation, this debt, the basis of the lien was created. And Bishop later says, well, we're actually shifting the focus to how the fund out of which this obligation, however it was created, could be satisfied. And, of course, it's the Supreme Court and they're entitled to do so. I understand. Two things. First off, in the Bishop case, I think you have to assume that all three of the requirements for the common fund doctrine were met in that the attorney created the fund, the beneficiary didn't participate in the fund, and they were compensated from the fund. If you apply that same reasoning to this case, we still, you know, we didn't participate in the case because we can't. We're not allowed. We can't just go into this defense case or into this personal injury case and assert our rights against the tort defeasor. And the difference between that and insurance theft is they can't. But simply sending a letter to the plaintiff's attorney saying, we don't want you to represent our interests, we'll do that ourselves. And once they do that and they go in and intervene in the case, the common fund doctrine doesn't apply. For our situation, being the hospital, since our only rights are against the patient plaintiff, we can't get involved in the personal injury case against the tort defeasor who ultimately is responsible for the case. But we have no rights against him. We don't stand in the shoes of the plaintiff in obtaining that fund. We're independent of that fund, and whether they get anything in the fund or not, we're still owed the money. Another point that I think... I guess we're down to the ultimate question. From a policy standpoint, why should you treat a creditor differently than you would a segregation claim? Well, I think first off because... Or should you treat them differently? Absolutely I think you should treat them differently. The segregation case, if the fund is not created, the insurance company does not get paid. They can't go back after the patient to receive their money or the defendant to receive their money. Once that's done, it's done. However, as the hospital having a lien against the plaintiff patient, let's say the patient loses the case. Well, our debt doesn't go away. That patient still owes that debt. And I think that's the biggest distinction between the two. And if you apply the common fund doctrine, another problem with applying it in this case is that you're actually hurting the plaintiff. Because instead of the hospital, let's say in the Wendlandt case, we would have been paid in full if the common fund doctrine hadn't been applied. Now we're getting say $800 as opposed to $1,200 or $1,100. We're now going to go back after that plaintiff's client to collect the balance. So they're going to have to pay. And that's why you allege there might be some type of a conflict between the plaintiff and his counsel.  Whereas the conflict wouldn't appear in the subrogation case. Because his client is not going to have to pay back the money to the insurance company if there's no client. The client's going to have to in the hospital case. So as a matter of public policy, I think by not applying the common fund doctrine, you're actually helping out the plaintiff themselves. How does it affect your argument that in Maynard, the basis of the decision of the Supreme Court did not at all mention the inability of the hospital to participate in the litigation that ultimately produced the fund? I don't believe they even looked at that, Your Honor. That's right. That's my question. I think in that case, the focus was more on the debtor-creditor relationship versus subrogate-subrogore. And they didn't want to expand the common fund doctrine to applying two things other than or two creditor relationships. Because I think the appellate court itself said they foresaw the common fund doctrine being applied to banks or being applied to furniture stores. Because they're going to get their debt paid because now this debtor has money. And they got the money from the fund. So when the debtor goes and pays off the furniture store or pays off their mortgage or they got behind on their mortgage and they pay that off. If you apply it to that situation, then you're saying that that attorney, since they created the fund to allow the plaintiff to make those payments, they're now going to get a third of that money. And then the debtor's right back in the problem again. They still owe a debt. So the attorney's getting his fee, but it's not helping the plaintiff. The plaintiff's now out one-third. They're going to have to pay it somewhere. I don't believe that Bishop even looked at that situation or even foresaw it. I think they were looking at more of a subrogation matter. I think they were focused more on the ERISA issue. And in fact, the Seventh Circuit Court of Appeals refused to follow it. So the only place it applies is in Illinois. Now, I realize we're in Illinois. But at the federal level, they said it does get preempted and the Common Fund document doesn't apply. That doesn't affect us here. Finally, I think, as the appellate court in Maynard stated and I kind of alluded to earlier, allowing the attorney's fees for a fund is capable of great abuse. And it should be exercised with the most zealous caution in regard to the rights of creditors. In cases such as this, it is better to leave those concerned to contract for the compensation to be paid for the services rendered or received. Quarterly, I ask this court respectfully to reverse the decision of the circuit court and find that the Common Fund doctrine does not apply to liens under the Illinois Health Care Services Lien Act. Thank you. Thank you, Counsel. Counsel? John Foley for Sherry Wending. Thank you. A claim under the Common Fund doctrine is, in effect, an independent action based upon the rights of the attorney creating the fund. It is not a contract action. Rather, it's an equitable doctrine based upon the principle that persons who obtain the benefit of a lawsuit without contributing to its costs are unjustly enriched. The petition to adjudicate liens filed in the Wendling case saw two forms of relief. That the circuit court adjudicate the hospital's liens, which were not admitted. And, pursuant to the Common Fund doctrine, that the court determine an attorney's fees based upon any benefit received by the hospitals in the form of payment out of the Common Fund. The record in the case that's been filed with the court demonstrates that a settlement fund was created as a result of legal services performed by Wendling's attorney. The claimant hospitals did not participate in the creation of a settlement fund and the claimant hospitals will benefit from the fund that was created. The question, it seems, is to whom does the Common Fund doctrine apply? And here, does it apply to the claimant hospitals? The answer is, it applies to those who benefit from the fund without contributing to its creation and or the costs of its creation and should apply to the hospitals. The hospitals, citing the Maynard case, maintain there's a distinction between claims of subrogors and creditors when determining the application of the fund doctrine. The hospitals assert that the fund doctrine does not apply to them because they are creditors of Wendling. And that the debt owed to them exists whether or not a fund was created in Wendling's lawsuit. It is their position they are owed a debt independently of the lawsuit and therefore do not realize a benefit by the creation of the settlement fund. The circuit court held that the Supreme Court in the Bishop case expanded the application of the Common Fund doctrine beyond that expressed in its earlier Maynard decision. The circuit court found that the hospital did receive a benefit from Wendling's lawsuit and ordered that the hospital should pay a pro-rata portion of the attorney's fee. The circuit court's rationale is contained in its record sheet, which is before this court. The key language in the Bishop case, as Judge Bomer has already recited here in court today, is found in the appellee's brief. Here the hospital's liens represent their charge upon the fund created by the plaintiff's lawsuit, seeking payment of their claim debts. The creation of the fund and the payment of the hospital's claim debts from the fund represents a benefit to the hospitals. The circuit court's application of the Common Fund doctrine in this case simply requires the hospitals to pay the cost of legal services relative to the benefit received or to be received. It recognizes there is a benefit to the hospitals in the creation of a fund which pays the hospitals' claim debts and saves them the cost of otherwise collecting that debt. Does the attorney, as the opposing counsel said, does the attorney for the plaintiff get a windfall? Could you address his assertion at least that the plaintiff himself ends up in kind of a worse situation when you apply the Common Law Fund because he's still going to be liable for the extra amount paid for the work of the attorney? The attorney's fee in this case is one-third of the fund created. The ruling of the circuit court simply affects what seems to be obvious, which is that the hospitals pay their pro rata share of that attorney's fee. In other words, their portion of the money taken out of the fund is assessed one-third just as is the remainder of the fund assessed one-third. The total attorney's fee in this case is one-third of the fund created. So, for instance, in this case the settlement is $10,500. The total fee is one-third of $10,500. It's not one-third of $10,500 plus one-third of the portion of the fund being paid to the hospitals for their debt. The way I view the Bishop case, and I think the Bishop court says, in this case the attorney is the person who we're talking about here. It's his services that are at issue here, whether you get those services free. But that court said the attorney could have waited until, in that case, the fund was reimbursed 100% and come into court independently and sought money from them for that. So, I guess my interpretation of this is that the hospitals realize a benefit in that they have attorney's services provided to them to perform a service for them that they simply have to pay for. That's all I have. Thank you. Thank you, Counsel. Counsel? In addressing Mr. Foley's assertion that there's no windfall to the attorney, in this case there may not be. I think that would be up to the attorney whether he's willing to take one-third of the total fund, one-third of the total fund plus one-third of the hospital needs amount. I think that's even asserted further when you said it's an independent action. So, he could take one-third of the settlement and then go, after that's already been paid, go back out to the hospital for a third of what they got. So, I think technically you could have a windfall. But regardless of whether the attorney gets the windfall or not, I think the plaintiff is still in a worse position. They may not have to pay the attorney one-third of what the hospital received, but then they have to turn around and pay the hospital what they didn't get, what the hospital didn't receive under their lien. The debt is still there. It's not gone away magically because the lien's gone. So, what the hospital will turn around and do is go back after the plaintiff against any other assets they may have. So, we could go back after, say, their house. We could make a claim on that. Yes, we'd have to go to court. We'd have to get a judgment. But that doesn't seem too difficult. You'd have to pay your attorney to do so. I'd get paid. But regardless of whether I'm going to court or setting up, I would be doing it since I'm in house counsel. So, the cost, there would not be any extra cost to the hospital except for the filing fees, which we would seek against the plaintiff himself. So, I think there could be a windfall to the attorney. But I think the more important point is you're not helping the plaintiff himself or herself by taking one-third from what the hospital would have gotten under the case itself. That money's got to go somewhere. Correct. If it doesn't go to the attorney, it's going to go to his client then. Who's then going to have to pay us. Right. So, that's a watershed. Pretty much, except for following later. The client's going to have to go back to court. And they're going to have to pay the fees that it costs us to do it. The filing fees they would have to pay, so it's costing them more money. In order for them to do this, they simply have to do it. Well, they could also agree that this was a legitimate bill and just pay them this. That's correct. They could. So, there doesn't have to be any additional cost. So, if that were the case, then why would they even want the attorney to take the one-third from what the hospital had? I mean, you could simply pay the attorney one-third of the fund and get the hospital paid and never have to deal with it again. Thank you, counsel. We appreciate the briefs and arguments of counsel. We'll take the case.